**COALITION FOR EDUCATION IN DISTRICT ONE et al., Plaintiffs-Appellees,**

v.

The **BOARD OF ELECTIONS OF CITY OF NEW YORK et al., Defendants-Appellants,**

**Carolyn Kozlowsky, Defendant-Appellant.**

**Nos. 1017, 1018, Dockets 74–1204, 74–1296.**

United States Court of Appeals, Second Circuit.

Argued April 8, 1974.

Decided April 24, 1974.

Doron Gopstein, New York City (Adrian P. Burke, Corp. Counsel, City of New York, Irwin L. Herzog, Jeffrey S. Karp, New York City, of counsel), for appellants.

Joseph Frost, New York City (A. W. Sereysky, New York City, of counsel), for appellant Carolyn Kozlowsky.

Charles E. Williams, III, New York City (Jack Greenberg, James M. Nabrit, III, Eric Schnapper, Fredrick E. Sherman, Ira S. Bezoza, New York City, of counsel), for appellees.

* Of the District Court for the District of Maryland, sitting by designation.

Before FRIENDLY and TIMBERS, Circuit Judges, and THOMSEN, District Judge.*

PER CURIAM:

The New York City Board of Elections, the Community School Board of School District One, and six members of the School Board elected on May 1, 1973 appeal from orders of the District Court for the Southern District of New York directing that a new election be held in District One and granting other relief.

In their complaint, filed on September 18, 1973, the Coalition for Education in District One, various unsuccessful candidates at the election and members of minority groups (black, Hispanic and Chinese) challenged the validity of the election under the Equal Protection clause of the Fourteenth Amendment and the Voting Rights Act of 1965 as amended in 1970, 42 U.S.C. §§ 1971, 1973 et seq. After extensive evidence had been taken on a motion for a preliminary injunction against certain actions of the school board which allegedly had been illegally elected, it was stipulated that the hearing so held should constitute a full hearing on the merits of the plaintiffs' claims, F.R.Civ.P. 65(a)(2). In an extensive opinion Judge Stewart found that various acts of employees of the Board of Elections had a discriminatory impact on the rights of minority voters that could have affected "several hundred" of the approximately 13,000 votes cast at the election[1]. Because of the complexities of the method of counting votes under the system of proportional representation, see Campbell v. Board of Education, 310 F.Supp. 94, 98–100 (E.D.N.Y. 1970), Judge Stewart ruled that even this small percentage might have altered the result. He directed that the election be declared invalid and the positions of the elected members be declared vacant; that a new election be held; and that

1. Judge Stewart found that, with a few minor exceptions, the discrimination against minority voters was not intentional.

meanwhile the Chancellor of the City School District of New York should exercise the powers of the previously elected board. Later he fixed May 14, 1974 as the date of the new election and denied a stay pending appeal. Another panel of this court also denied a stay but expedited the appeal.

School District Number One, located on the lower east side of Manhattan, has been subject to considerable dissension, due in large part to an imbalance in ethnic composition between the district's adult population, which is predominantly white, and its student population, which is 92.6% black, Hispanic and Oriental. Since New York allows parents of students to participate in school board elections even when they are not otherwise eligible to vote in the district, this imbalance carries over into the electoral process. Despite the absence of official slate affiliations on the ballots, the election of nine members of the school board on May 1, 1973, was in substance a struggle between two factions, one sponsored by the plaintiff Coalition for Education in District One, and the other sponsored by the Committee for Effective Education, an organization supported by the United Federation of Teachers. The Coalition slate was comprised of the then incumbent board, most of whom were members of minority groups. The slate put forward by the Committee for Effective Education was composed of eight white candidates and one black. There was a large turnout for the election, with 22.45% of the eligible voters casting ballots as against averages of 8.29% for Manhattan and 10.38% for the entire city. Six members of the Committee's slate and three of the Coalition's were elected.

The picture of the May 1 election that emerges from the district court's opinion is one of general confusion, with minority voters the primary victims of the disorder. Parent voters [2] and non-English speaking voters were particularly disadvantaged by this. Materials arrived late at several polling places which predominantly served minorities, and at one site the parent voter materials failed to arrive at all. Bilingual instructions and other materials were not readily available at a number of polling sites, and there was substantial confusion as to where parent voters were supposed to vote. Most important, the court noted that election inspectors and interpreters were inadequately trained to handle the extraordinary difficulties of the May 1 election. In using alphabetized lists of the names of registered voters, for example, the inspectors often failed to locate Chinese and Spanish names, which the court found caused substantial delays and in some cases resulted in the denial of voting rights. In addition, the court found that the inspectors followed an inconsistent course with respect to requiring voter identification of all prospective voters: voters at many minority polling sites were required to produce identification, while at most predominantly white polls no such requirement was enforced. Besides these election-day irregularities, the court found that changes in election district lines between November 1972 and the May 1, 1973 election had resulted in changes of polling places for many minority voters, and that the Board of Elections had failed adequately to advise many of the voters of the location of their new polling sites. In addition, the court pointed out that six polling sites were conveniently located in large, predominantly white, middle-income housing projects, while no polls were located in predominantly minority-occupied buildings. Finally, the court found that although there was no pattern of intentional discrimination, there were scattered instances of discriminatory conduct by election inspectors, which contributed to the discriminatory impact of the election on minority voters.

2. Since 93% of the district's student population is of minority ethnic background, the parent voters were almost entirely minority group members.

Appellants have mounted a detailed challenge to the judge's findings concerning the discriminatory impact of the various irregularities and the effect of these on the election. Pressing the latter point further, they contend that in any event complete invalidation of the election was unwarranted. They also argue that plaintiffs failed to display the pre-election and post-election diligence required to justify the relief granted. Pointing out that invalidation of an election is drastic action for a federal court to take, they urge that in effect the instant decision means few elections will be immune from challenge, and none can be regarded as final until months after the ballots are counted.

■ In answer to appellants' first set of claims, appellees implant themselves solidly on the "unless clearly erroneous" rule, F.R.Civ.P. 52(a). Actually there is no serious dispute with regard to most of the basic facts that Judge Stewart found. The controversy relates rather to the inferences he drew concerning the discriminatory effect of the various irregularities on minority groups,[3] what appellants claim to be his disregard of evidence contrary to these inferences,[4] and his finding that the discrimination was sufficiently pervasive to have affected the outcome of the election. Many of these criticisms appear to us to have substantial force. We have serious doubt whether, if any of us had been sitting as the district judge, we would have entered the orders here under review, and we therefore do not wish our affirmance to be taken by district judges as any mandate to reach the same result on similar facts. But we have been instructed that the "unless clearly erroneous" rule "applies also to factual inferences from undisputed basic facts," and that the consequent diversity in result is not too high a price to pay for the benefit of the greater time which a trial judge can give to a particular case and his advantage in having seen and heard the witnesses, C. I. R. v. Duberstein, 363 U.S. 278, 291, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960).[5] With respect to the inferences of discriminatory

3. For example, while appellants do not challenge the finding that on some occasions minority voters were asked for identification at the polls, they attack the court's broad conclusion from rather scanty evidence that election officials followed a general pattern of requiring identification only at minority polling places. Appellants similarly challenge the court's finding that changes in election district lines had a substantially discriminatory impact. An examination of the election districts in which all the voters were required to change polling sites shows that the impact of these changes was only slightly greater on minority than on white voters. Moreover, the evidence that some minority voters did not get adequate notice of the changes in poll locations was meagre, and the appellants suggest that the court should not have concluded from the evidence on the record that this factor had a substantial discriminatory effect on minority voters.

4. Among the factors that the appellants claim the district court improperly ignored were: (1) voting materials were late in arriving at several predominantly white polling sites, not just at minority polls; (2) the percentage of invalid ballots in District One was below the average for Manhattan in the May 1 election, indicating that the Board of Elections had been reasonably successful in educating the voters as to the proper means of casting their ballots; and (3) the change in election district boundaries, which the court characterized as largely unexplained, was made pursuant to a state-wide reapportionment plan mandated by "one man-one vote" principles.

5. Diverse results on essentially the same facts do appear much more offensive when the controversy is public in nature than in a private law question such as that presented in *Duberstein*, whether the transfer of an automobile was a gift or remuneration for services rendered. However, so far as we are aware, the Supreme Court has not indicated that the "unless clearly erroneous" rule is to be relaxed in constitutional or other public cases coming from federal district courts, as distinguished from its established practice of reexamining factual findings on review of denial of constitutional claims by state courts. See Stein v. New York, 346 U.S. 156, 181, 73 S.Ct. 1077, 97 L.Ed. 1522 (1953); Haynes v. Washington, 373 U.S. 503, 515–516, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963); Cox v. Louisiana, 379 U.S. 536, 545 n. 8, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965). The conflicting attitudes as to the roles of the district court and the court of appeals

impact and consequent effect here drawn from the facts, we find ourselves unable to make the required pronounce-ment of having a "definite and firm conviction that a mistake has been com-mitted," United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948).

■ Appellants' attack on the scope of the remedy collides with another limi-tation on appellate review, namely, that the shaping of a remedy is largely for the district courts. Despite the vagaries of proportional representation and the method of tabulation here employed, we must confess most serious doubt that even the several hundred votes that Judge Stewart estimated to be affected by the discriminatory impact of the ir-regularities could have prevented the election of candidates like Mildworm, Price and Goodman, who made "quota" [6] with first choice ballots of 1408, 1339 and 1273 respectively, and could have caused the election of tenth place candi-date Beck who received only 563 first choice votes, and reached a total of 994 only after many lower choice ballots were transferred to him from candidates who had been elected or eliminated. It is even more unlikely that the extra votes could have appreciably helped Coa-lition candidates Cordero, Tam and Suarez, who received only 557, 310 and 185 first choice votes, respectively. In light of these figures, a decree invalidat-ing the election of the two or three low-est scorers and directing a new election to fill their places would seem to have

afforded ample relief. But we have also been instructed that, within the bounds of rationality, "[t]he framing of decrees should take place in the District rather than in Appellate Courts," International Salt Co. v. United States, 332 U.S. 392, 400, 68 S.Ct. 12, 17, 92 L.Ed. 20 (1947). See Chance v. Board of Examiners, 458 F.2d 1167, 1178 (2 Cir. 1972); Vulcan Society v. Civil Service Commission, 490 F.2d 387, 399 (2 Cir. 1973).

■ The remaining issue is that of pre- and post-election diligence. We agree with the court's conclusion that plaintiffs cannot be faulted for lack of pre-election diligence. See Toney v. White, 488 F.2d 310 (5 Cir. 1973) (en banc). The only major problem of which they were aware before the elec-tion was the alteration in election dis-trict lines and the consequent change of polling places for many minority voters. However, plaintiffs cannot fairly be held lacking in diligence on that score, since the harm was not the change in polling sites *simpliciter* but the unanticipated failure of the Board of Elections to ad-vise some voters where to go.[7] Finally, while appellant Kozlowsky has claimed that appellees failed to exercise post-election diligence, appellees say that is-sue was not raised below, which Koz-lowsky has not denied. We thus need not determine whether the four-month delay between the election and the filing of the complaint might otherwise have barred the relief here granted.

Affirmed.

---

displayed in the recent opinions in Mayor of Philadelphia v. Educational Equality League, 415 U.S. 605, 621 n. 20, 94 S.Ct. 1323, 39 L.Ed.2d 630 (1974), may presage, however, that the problem will receive further atten-tion.

6. "Quota" is a figure determined by dividing the number of ballots by the number of of-fices to be filled, plus one. Written as a formula, it is

$$Q = \frac{B}{n+1}$$

7. Plaintiffs also challenged the placement of six polling sites in predominantly white, mid-dle-income housing units, and the Board's failure to place polls in predominantly mi-nority-occupied buildings. Although Judge Stewart found that this practice had a dis-criminatory impact, he did not appear to place great weight on it. Plaintiffs could have challenged the poll placement prior to the election, but their failure to seek pre-election relief on this point is not a suffi-cient basis to overturn the court's finding of substantial discriminatory impact in the elec-tion process.