**Luis FUENTES, Plaintiff,**

v.

**Adolph ROHER et al., Defendants.**

**No. 73 Civ. 5455.**

United States District Court,
S. D. New York.

March 18, 1975.

Supplemental Opinion April 3, 1975.

Puerto Rican Legal Defense and Education Fund, Inc., New York City, Herbert Teitelbaum, Richard J. Hiller, and Kenneth Kimerling, New York City, for plaintiff.

Corporation Counsel for the City of New York, New York City, Doron Gopstein, and Jeffrey S. Karp, for defendants.

## MEMORANDUM

STEWART, District Judge:

Plaintiff Luis Fuentes brought this action in December, 1973 pursuant to 42 U.S.C. § 1983 seeking preliminary and permanent injunctions against defendant members of Community School Board Number One in Lower Manhattan to set aside plaintiff's suspension with pay from his position as that board's superintendent.[1] Fuentes alleges that his suspension violated and penalized his exercise of free speech, freedom of association and political expression, and his right to procedural due process. He also seeks a declaratory judgment that his suspension was unlawful. In addition, Fuentes contends that his suspension violates his rights guaranteed by New York Education Law, McKinney's Consol. Laws, c. 16, Article 52–A, Section 2590 et seq., and the contract of employment dated October 31, 1972 between Fuentes and the members of the board at that time. Fuentes also seeks, as a pendent claim, an order declaring that the board's charges brought against him in October, 1973 are defamatory and awarding him damages. Pursuant to his supplemental complaint of August 18, 1974, Fuentes has increased his damages claim for defamation from $250,000 to $350,000, and has added as defendants those members of Community School Board Number One who were elected in a special election held last May by order of this court.[2]

Shortly after the supplemental complaint was filed, plaintiff Fuentes moved for a preliminary injunction to enjoin the members of the board from suspending him with pay and the defendants cross-moved to dismiss the action. While those motions were pending, plaintiff moved for a preliminary injunction to enjoin the commencement of the administrative hearings relating to the charges against him which led to his suspension. That motion was denied from the bench on November 12, 1974, but this court subsequently granted plaintiff's motion for reargument.

In order to properly consider the issues presented, a review of the factual background is necessary.

### I. Factual Background

Plaintiff Fuentes was originally suspended without pay in October, 1973 by the then-members of Community School Board Number One. At that time 31 charges were brought against him including one that he "engaged in partisan political conduct during the campaign for the election of the Community School Board members in District 1 on May 1, 1973." Fuentes alleged that his suspension on this ground was a violation of his first amendment rights, and that the other charges against him were without foundation.

The original complaint was filed December 21, 1973, but no action was taken, due to an earlier order by this court in a related case, Coalition for Education in District One v. Board of Elections, City of New York, 370 F.Supp. 42 (S.D.N.Y.) aff'd, 495 F.2d 1090 (2d Cir. 1974). That order, dated October 19, 1973, temporarily restrained the defendant Community School Board of District One and its members from:

implementing the suspension of Luis Fuentes as Community Superintend-

---

1. Although nine 1973 and 1974 members of Community School Board One are nominal defendants, this action has been contested only by the past and present majorities on the school board which voted to suspend Fuentes. Hereafter, the term "defendants" refers only to the defendant majority members of the school board.

2. See Coalition for Education in District One v. Board of Elections, City of New York, 370 F.Supp. 42 (S.D.N.Y.1974), aff'd, 495 F. 2d 1090 (2d Cir. 1974).

ent of Schools including but not limited to: (a) suspending his pay; (b) preventing him from fulfilling the duties of a Community Superintendent of Schools as required by the New York State Education Law and the rules and regulations of the New York City Central School Board.

That order was to remain in effect pending the outcome of the case, in which we ordered a special community school board election to be held on May 14, 1974, under the supervision of a court-appointed special board. [3]

On August 8, 1974, the newly elected members of the Community School Board passed a resolution (5–0, with four abstentions) preferring 41 charges against Fuentes and suspending him with pay pending hearing and determination of the charges. The hearing, before a person to be designated as trial examiner by the board,[4] with full notice and opportunity for Fuentes to be present with counsel, was scheduled to commence August 28, 1974. The resolution further provided that the report and recommendations of the trial examiner would be received and acted upon by the board. Appointing Deputy Superintendent Annie Mersereau to be acting superintendent, the board directed Fuentes to remain away from the District offices and from the school buildings under the jurisdiction of the board pending the outcome of the hearing.

In its resolution, the board explained its reasons for suspending Fuentes:

Serious charges against Mr. Fuentes have been presented and are now before the Board for decision. In his dealings with members of the Community School Board, Mr. Fuentes has exhibited antagonism, disrespect and truculence. He has openly flaunted his hostility toward and disregard of the lawful directions of, the duly elected Board, thereby contributing to the disruption of the educational processes in the District. He has publicly called for opposition to the lawful decisions, actions and directions of the School Board and has served as a rallying point and focus for the small minority which has interfered with the Board in the exercise of its duties and its authority.

The board also declared that it "must take appropriate action on charges which have been filed against the Community Superintendent because of their serious nature." During the meeting, the five person majority on the board distributed a copy of the specifications of charges to the four minority board members; Fuentes did not receive a copy of the specification of charges until after the board had approved its resolution.

The 41 charges include the 31 charges originally brought against him, plus ten additional charges concerning events subsequent to the filing of the initial charges. The charges involve allegations that Fuentes improperly and illegally committed and expended school funds; that Fuentes was insubordinate, rude, and disobedient towards members of the school board; that Fuentes breached his employment contract dated October 31, 1972 by making appointments without notifying the board of existing vacancies; and that Fuentes failed and/or refused to implement resolutions and actions duly adopted by the board at its meetings. The charges also

---

3. As a result of the May, 1974 election, the composition of the nine member board changed, so that the majority backed by the United Federation of Teachers and the Committee for Effective Education was reduced from six to five.

4. The hearing examiner, Marcy H. Cowan, was notified of his appointment in September, 1974 by Richard Aronstein, attorney for the Community School Board. However, Cowan was not formally appointed by the local board until November 7, 1974; the appointment was made retroactive to August 22, 1974. Cowan was approved by a vote of five in favor, three abstentions, and one absent. Earlier last month, Cowan withdrew as hearing examiner; the Community School Board has not yet chosen a replacement.

allege that Fuentes failed and neglected to investigate incidents of assaults on children and on a parent after being directed to do so in June of 1974. And the charges further allege that Fuentes improperly engaged publicly in partisan political activity on behalf of certain candidates for election to the school board in May of 1974. In addition, the charges accuse Fuentes of misconduct in improperly soliciting campaign funds and conspiring to disrupt school board meetings during certain months of 1973.[5]

Believing that his suspension was illegal in that it violated his rights under his employment contract, was enacted in contravention of state and federal law, and took place despite the alleged failure of the majority members of the school board to give him and the public a copy of the charges before the board's vote, Fuentes returned to work on Friday, August 9, 1974.

The following Monday, August 12, Justice Bernard Nadel of the New York Supreme Court (New York County) signed a temporary restraining order enjoining Fuentes from, *inter alia*:

> entering upon the premises of any building or facility under the direction and control of Community School District # 1 or remaining thereon except with the permission of the Community School Board or a duly authorized agent thereof . . . [and from] . . . preventing, hindering, or in-

terfering in any way with the administration of the schools, staff or operations of Community School District #1.

Roher v. Fuentes, 46 A.D.2d 1016, 362 N.Y.S.2d 841 (Sup.Ct., N.Y.Cty.). This temporary restraining order was made effective pending a hearing for a preliminary injunction.

After this restraining order had been entered, Fuentes did not move to have it vacated, but instead sought to remove the state action to federal court. Roher v. Fuentes (S.D.N.Y., 74 Civ. 3524). Plaintiff Roher then moved by order to show cause to remand the case to state court. After hearings before this court on August 15 and 19, Judge Richard Owen granted plaintiff Roher's motion to remand and also made Justice Nadel's temporary restraining order against Fuentes an order of this court, thus continuing it in full force and effect. Judge Owen further denied a motion by Fuentes for a temporary restraining order enjoining the board from enforcing its suspension of him.

On August 26, 1974, attorneys for Fuentes successfully adjourned a hearing scheduled to be held in State Supreme Court on Roher's motion for a preliminary injunction against Fuentes. However, Justice Morris Spector specifically extended until September 4 the temporary restraining order previously signed by Justice Nadel and continued in effect by Judge Owen.[6]

---

5. Examples of the apparently more serious charges against Fuentes include the following: (a) that Fuentes on September 25, 1973 falsely stated and reported to the board that he had conducted a complete investigation of alleged improprieties occurring on school property involving hiring of personnel for a proposed bilingual program; (b) that in August, 1973, Fuentes threatened violence and danger to the persons of members of the Board in the future in the event that they did not make "wise" decisions; (c) that Fuentes failed to conduct an investigation in September of 1973 of charges of anti-Semitism at Junior High School 22, as the board had directed; (d) that Fuentes conspired with and aided certain individuals in July and

August of 1973 in their efforts to impede, disrupt, and interfere with the conduct of Public School Board meetings; and (e) that in May, 1974, Fuentes illegally and improperly permitted a successful bidder for the school lunch program contract to withdraw its bid in favor of granting the contract to a higher bidder.

6. The temporary restraining order was extended several times until October 11, 1974, at which time Judge Samuel R. Rosenberg preliminarily enjoined Fuentes from entering the grounds of School District Number One, pursuant to the same terms as the prior TRO. In his formal order of October 11, Judge Rosenberg was apparently misinformed and so referred to this court's denial of a temporary

On August 28, meanwhile, the administrative hearing involving the charges against Fuentes did not begin as scheduled, since Fuentes' counsel advised the trial examiner that "pending litigation in both federal and state courts related to the matter here makes such a meeting inadvisable at the present time."

At about this point, Fuentes began to relitigate his origianal action in federal court which had been filed in December of 1973 to set aside his suspension. On August 22, plaintiff Fuentes sought from this court a temporary restraining order and a preliminary injunction enjoining his August 8, 1974 suspension by the board. This court denied the motion, finding that, while Fuentes raised substantial and difficult constitutional issues, he had not shown that "he, personally, would be irreparably harmed pending a fuller hearing for a preliminary injunction." We also concluded that Fuentes had not demonstrated that his ability to perform the "duties as superintendent in the future has now or will be impaired by what might be just a temporary suspension."

After attending one session of the administrative hearing, which had been rescheduled from August 28 to September 24,[7] Fuentes filed the present motion to suspend the administrative hearings relating to the charges against him. This motion was brought on by an order to show cause signed September 27 by this court. Three days later, Fuentes' attorneys sent a letter to the hearing examiner indicating that the order to show cause had been signed, and advising him that in light of the pendency of the preliminary injunction motion, Fuentes "will appear at no further meetings nor serve any papers in this matter."[8]

In arguing the preliminary injunction motion to suspend the administrative proceedings before this court, attorneys for Fuentes contended that hearing examiner Marcy Cowan had indicated at the September 24th meeting that he would be able to hold hearings only during two, two-hour sessions per week. During the September 24th meeting, however, Fuentes' attorneys had not objected to the proposed schedule of meetings. On October 3, 1974, Cowan wrote to Fuentes' attorneys that, while no objection had been made to the proposed schedule on September 24, he was willing to hold "full day session[s] as often as the parties desire in order to expedite things."[9]

Meanwhile, after hearings before this court on Fuentes' motion to enjoin the administrative proceedings, this court signed a temporary restraining order on October 11 enjoining "defendants, their agents, employees and representatives . . . from proceeding with or otherwise causing the administrative hearing to proceed pending the holding of an evidentiary hearing before this court scheduled for October 21." The evidentiary hearing was scheduled to consider the questions of alleged bias on the part of defendants and the purported futility of the administrative process. The effect of signing this temporary restraining order was to stay the administrative hearings which had been scheduled to proceed on October 16th.

Shortly after the temporary restraining order was signed, defendants moved before this court for reconsideration of that decision. Having concluded that the evidentiary hearing before this court should commence expeditiously, but that the administrative hearing should not be

restaining order sought by Fuentes as a denial of a preliminary injunction. Judge Rosenberg's decision was affirmed without opinion recently by the Appellate Division, First Department, 362 N.Y.S.2d 841 (1974).

7. Only scheduling of the administrative hearings was discussed on September 24. During this meeting, hearing examiner Cowan proposed that the hearings take place during two, two-hour sessions each week.

8. The letter, dated September 30, stated that the order to show cause had been signed that same day. Actually, it was signed September 27.

9. See transcript, In the Matter of Luis Fuentes, September 24, 1974.

stayed, this court acted on October 21 to modify its order of October 11. As a result, the court's evidentiary hearing on the issues of defendants' bias and the futility of the administrative procedure was rescheduled to commence on October 25, and the stay of the administrative hearings was rescinded.

In accordance with the court's order of October 21, evidentiary hearings began as planned on October 25, and continued for several days. This court heard extensive testimony from, among others, hearing examiner Marcy Cowan, defendant school board members Adolph Roher and Richard Lee Price, and defendant ex-school board member Donald Brown. The testimony focused on the issues of the alleged bias against Fuentes of Cowan and defendant majority members of the school board.[10]

Following these hearings, this court orally denied plaintiff's motion to suspend the administrative hearings on November 12, 1974. In announcing our decision, we concluded that Fuentes would not suffer irreparable harm by proceeding with the administrative hearing. (Tr.737). We further found that trial examiner Marcy Cowan "indicated an ability to act on this matter impartially" (Tr.735) and that Cowan "will deal with this objectively and impartially." (Tr.737). We also concluded that Fuentes had failed to prove that the defendant members of the board would be biased in passing on the record developed by Cowan as trial examiner.

Fuentes then moved for reargument and reconsideration of our oral decision. We granted that motion, and heard oral argument on December 2. It is this motion for reargument which is now before us.

In addition to affirming our decision of November 12, we now grant defendants' motion to dismiss. At this same time, we deny Fuentes' motion to enjoin

his suspension and dismiss his pendent state claims. We also dismiss defendant Richard Lee Price's federal- and state-based counterclaims. We will first describe the provisions in Fuentes' contract which are in dispute, and then turn our attention to the merits.

### II. *Fuentes' Contract*

By statute, a community school board contracts to hire a community school superintendent who is subject to removal for cause. New York Educ.Law § 2590–e(1)(a) (McKinney 1970).[11] This section, § 2590–e, contains no specific reference to the power of a school board to suspend a school superintendent, with or without cause.

In accordance with this section, Fuentes signed a three-year contract with the then-members of the Community School Board covering the period from August 1, 1972 until July 31, 1975, "subject to the right of the School Board to terminate this agreement as hereinafter provided." The contract provides that Fuentes shall be subject to "dismissal by the School Board (acting by a two-thirds majority vote) upon six month's notice for cause by the School Board . . ." It further provides in pertinent part:

> Cause shall consist only of those matters enumerated in subdivision 7(b) of Section 2590–(j) of the Education Law. School board, except as they shall be inconsistent herewith, shall be subject to the procedural rules of subdivision 7 of Section 2590–(j) of the Education Law, provided that school board shall have such powers and duties as are therein prescribed for the Community Superintendent.

Fuentes' contract contained the variant that powers normally delegated by Section 2590–j(7) to the Community Superintendent were transferred to the Community School Board. As a result, the

school superintendents remain subject to removal for cause.

10. *See* pages 1236–1242, *infra.*

11. This section was amended in other respects after Fuentes signed his contract in 1972, but

Board assumed the responsibility of initiating the charges, informing the employee accused of the nature of the complaint in advance of the filing of charges and specifications, and appointing one or more trial examiners. Section 2590–j(7)(b), (c), and (f). The Board duly complied with these responsibilities.[12]

Section 2590–j(7)(f) further provides that the trial examiner shall conduct a hearing and prepare a report for the community school board. The board may then "reject, confirm or modify the report of the trial examiner . . ." *Id.* Although any adverse determination by the board may be appealed to the city board,[13] Fuentes believes that this administrative procedure violates his constitutional right to procedural due process.[14]

### III. *Irreparable Harm*

■■ For a preliminary injunction to be granted, irreparable harm to the plaintiff must be demonstrated. Sampson v. Murray, 415 U.S. 61, 88, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974), *quoting* Beacon Theatres, Inc. v. Westover, 359 U.S. 500, 506–07, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959). In considering granting a preliminary injunction to stay an administrative procedure, "[t]he District Court, exercising its equitable powers, is bound to give serious weight to the obviously disruptive effect which the grant of the temporary relief . . . [is] likely to have on the administrative process." Sampson v. Murray, *supra,*

415 U.S. at 83, 94 S.Ct. at 949. Before granting such a preliminary injunction in government personnel cases, the district court must find irreparable injury sufficient in kind and degree to override the "well established rule that the Government has traditionally been granted the widest latitude in the 'dispatch of its own internal affairs,' Cafeteria Workers v. McElroy, 367 U.S. 886, 896, [81 S.Ct. 1743, 1749, 6 L.Ed.2d 1230,] (1961), and the traditional unwillingness of courts of equity to enforce contracts for personal service either at the behest of the employer or of the employee, 5A A. Corbin, Contracts § 1204 (1964) . . . " Sampson v. Murray, *supra,* 415 U.S. at 83–84, 94 S.Ct. 937, at 949.

■ Here, plaintiff urges in connection with his motion to enjoin the administrative procedure that he is irreparably harmed by being compelled to utilize an unconstitutional and futile administrative procedure. Fuentes makes this claim because the majority school board members who will initially pass on his suspension are allegedly biased against him, and because those same board members will ostensibly serve as prosecutors, witnesses, and judges in his case. Since we find, however, that the administrative procedure is constitutionally sound, we find no irreparable harm to Fuentes in this regard.[15] Moreover, we do not believe that any harm to Fuentes here is sufficient to warrant the conclusion that we should in effect enforce a personal service contract.

12. The minority members of the school board unsuccessfully challenged the procedures followed by the board's majority in calling the August 8, 1974 meeting and in preferring charges against Fuentes. Their challenge was turned down by the Chancellor (August 19, 1974) and the New York City Board of Education (September 4, 1974). An appeal is presently pending before the State Commissioner of Education (Ramos v. Board of Education).

13. Section 2590–j(7) provides for appeal of the decisions of the local board to the city board. Moreover, further appeal may be had

to the State Commissioner of Education pursuant to Section 310 of the Education Law. While the contract contemplates such an appeal, it is unclear whether the city board and the state commissioner would consider themselves bound to hear appeals in the instant case, since they were not parties to the contract of employment between Fuentes and the former local school board. However, we need not reach this question here, since the defendants on several occasions have indicated that such appeals would lie.

14. *See* pages 1236–1242, 12a, *infra.*

15. *See* pages 1236–1242, *infra.*

In his motion to enjoin his suspension, Fuentes contends that his reputation and liberty were irreparably harmed by "the continuing charges made by the [United Federation of Teachers] backed defendants . . . ." Memorandum of Law in Support of [Plaintiff's] Motion for a Temporary and Preliminary Injunction, at 18. We disagree. In denying Fuentes' motion on September 4, 1974 for a temporary restraining order to set aside his suspension with pay, we concluded that "it is the final outcome in this controversy that will either harm or vindicate his reputation." The Supreme Court held in Sampson v. Murray, *supra*, moreover, that humiliation and damage to reputation arising out of a suspension from work do not constitute irreparable injury for purposes of granting a preliminary injunction.

■ We must also reject Fuentes' contention that he is entitled to injunctive relief in certain circumstances apparently without a showing of immediate irreparable injury. Fuentes argues that injunctive relief is warranted before any adverse action is taken against him, since he is challenging the constitutionality of the administrative procedure available to him. Fuentes relies for this proposition on Gibson v. Berryhill, 411 U.S. 564, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973), but we believe such reliance is misplaced. In *Gibson*, plaintiff optometrists brought suit in federal court to enjoin the Alabama Board of Optometry from passing on charges of unprofessional conduct against them on the ground that they had accepted employment with a corporation and hence were practicing optometry in violation of state law. The plaintiffs argued that the administrative hearing before the Board of Optometry was unconstitutional, since the board's members alleg-

edly had prejudged the case against plaintiffs and purportedly had an indirect pecuniary interest in the outcome.

The district court in *Gibson* upheld the plaintiffs' claims, finding that if the plaintiffs had been forced to rely upon a state administrative procedure which it found to be inadequate, plaintiffs would be effectively deprived of their property, their right to practice as optometrists, and that "irreparable injury would follow in the normal course of events." Berryhill v. Gibson, 331 F.Supp. 122, 126 (M.D.Ala.1971) (citations omitted). The Supreme Court affirmed the decision of the district court without specifically discussing the question of irreparable injury.[16] Instead, the Court concluded that exhaustion of administrative remedies was not required, and hence injunctive relief was appropriate, since the district court found the administrative remedy inadequate.

Here, however, the situation is different. Although Fuentes has been suspended, he has been receiving his salary and he has not been deprived of his right to practice as a school superintendent. He is free to seek similar employment either now or at the termination of his contract in July of 1975. Moreover, since we find that the administrative remedy here is constitutionally adequate,[17] we find that Fuentes will suffer no irreparable injury by being required to exhaust his administrative remedies. Absent some other showing of irreparable harm, we cannot conclude that Fuentes has suffered any irreparable injury; consequently, injunctive relief is not warranted.

IV. *Exhaustion of Administrative Remedies*

We now turn to the question of exhaustion of administrative remedies.

16. The Supreme Court held that the administrative hearing was unconstitutional on the ground that the members of the Board of Optometry had a pecuniary interest in the outcome. The court specifically refrained from deciding whether the board members' passing on charges against plaintiffs despite their al-

leged bias against them was a violation of procedural due process. Gibson v. Berryhill, 411 U.S. 564, 579, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973).

17. *See* pages 1236–1242, *infra*.

Fuentes claims that, since he brings his action pursuant to 42 U.S.C. § 1983, exhaustion of state administrative remedies is unnecessary. This claim is based on the Supreme Court's holding in Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), that "[t]he federal remedy is supplementary to the state remedy, and the latter need not be first sought and refused before the federal one is invoked." 365 U.S. at 183, 81 S.Ct. at 482. *See also* Gibson v. Berryhill, *supra;* Carter v. Stanton, 405 U.S. 669, 92 S.Ct. 1232, 31 L.Ed.2d 569 (1972); Wilwording v. Swenson, 404 U.S. 249, 92 S.Ct. 407, 30 L.Ed.2d 418 (1972); Houghton v. Shafer, 392 U.S. 639, 88 S.Ct. 2119, 20 L.Ed.2d 1319 (1968); King v. Smith, 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968); Damico v. California, 389 U.S. 416, 88 S.Ct. 526, 19 L.Ed.2d 647 (1967); McNeese v. Board of Education, 373 U.S. 668, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963).

We believe, however, that Monroe v. Pape and its progeny interpreting the exhaustion requirement in § 1983 cases are distinguishable from the instant case. In Eisen v. Eastman, 421 F.2d 560 (2d Cir. 1969), cert. denied, 400 U.S. 841, 91 S.Ct. 82, 27 L.Ed.2d 75 (1970), the Second Circuit distinguished Houghton v. Shafer, *supra;* King v. Smith, *supra;* Damico v. California, *supra;* and McNeese v. Board of Education, *supra.* The Second Circuit interpreted those decisions as:

> simply condemning a wooden application of the exhaustion doctrine in cases under the Civil Rights Act. Exhaustion of state administrative remedies is not required where the administrative remedy is inadequate, as in *McNeese,* or where it is certainly or probably futile, as in *Damico, Smith,* and *Houghton.*

421 F.2d at 569. The court further stated, however, that:

[a] quite different situation would be presented, for example, when a complaint alleged that a subordinate state officer had violated the plaintiff's constitutional rights by acting because of bias or other inadmissible reasons, by distorting or ignoring the facts, or by failing to apply a constitutional state standard, and the state has provided for a speedy appeal to a higher administrative officer . . . .

*Id.*

More recently, the Second Circuit considered this "quite different situation" in Blanton v. State University of New York, 489 F.2d 377 (2d Cir. 1973). In *Blanton,* the court extended *Eisen* and distinguished recent holdings of the Supreme Court which seemed to indicate that exhaustion of state remedies was not required in civil rights cases. Gibson v. Berryhill, *supra;* Carter v. Stanton, *supra;* Wilwording v. Swenson, *supra.* More specifically, the court pointed out that *"Gibson v. Berryhill* seems to support our conclusion in *Eisen* that the doctrine requiring exhaustion of administrative remedies is not dead in civil rights cases . . ." 489 F.2d at 384. And even more recently a Connecticut district court declared that *Gibson* and *Blanton* "leave little doubt that a plaintiff cannot turn his back on an adequate state administrative remedy and 'rush into a federal forum.'" Perzanowski v. Salvio, 369 F.Supp. 223 (D. Conn.1974).

The thrust of these cases is that "a plaintiff challenging the constitutionality of state action must exhaust speedy and effective state administrative remedies." Blanton v. State University of New York, *supra,* 489 F.2d at 383. Since we find in our discussion below that plaintiff's state administrative remedy is effective, and since we have been shown no evidence that it will not be speedy,[18] we conclude that Fuentes

---

18. We have been advised by counsel for plaintiff in affidavits dated February 20 and February 28, 1975 that hearing examiner Cowan resigned in early February and that as of February 28 no new hearing officer had been chosen. The failure of defendants to appoint promptly a new hearing officer obviously bears importantly upon the adequacy of the

should exhaust his state administrative remedies in the instant case.

Plano v. Baker, 504 F.2d 595 (2d Cir. 1974) does not require a contrary conclusion. In *Plano,* the Second Circuit reaffirmed the exhaustion of state administrative remedies requirement set forth in *Eisen* and *Blanton,* despite language by the Supreme Court in Steffel v. Thompson, 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974), that "we have not required exhaustion of state judicial or administrative remedies" in actions premised on 42 U.S.C. § 1983. 415 U.S. at 472–73, 94 S.Ct. at 1222–1223. The Second Circuit distinguished *Steffel* on the ground that the above-quoted language was only dictum, and reaffirmed that "there are benefits to be derived from a sensible application of the exhaustion doctrine." 504 F.2d at 597. Although the *Plano* court found that the

administrative remedy before it was inadequate, it declined to dispense with the exhaustion requirement where adequate state administrative remedies are present. Since we find that the administrative remedy here is constitutionally adequate,[19] exhaustion of state administrative remedies is warranted.

### V. *Bias of Hearing Examiner Cowan and Defendant Board Members*

Assuming, without deciding that Fuentes is entitled to all the safeguards of procedural due process,[20] we deny his motion to set aside the administrative procedures since we find those procedures constitutionally adequate.[21]

### A. Combination of Functions

■ Fuentes attacks the administrative process here as violative of procedural due process,[22] because, he says, the

administrative procedures to provide plaintiff with a speedy administrative remedy. If this situation continues, the court will be disposed to consider an appropriate remedy.

19. *See* pages 1236–1242, *infra.*

20. Since we find that Fuentes has not suffered irreparable harm and that his administrative remedy is constitutionally adequate, we need not decide whether he has been deprived of liberty and property under the fourteenth amendment's due process clause. However, it appears that Fuentes is entitled to the safeguards of procedural due process on the basis of the Supreme Court's recent holding in Goss v. Lopez, 419 U.S. 565, 95 S.Ct. 729, 43 L.Ed.2d 725 (1975). In that case, the Court held that high school students are entitled to the safeguards of procedural due process before they can be suspended. Specifically, the Court held that a student's damage to his reputation following his suspension is a constitutionally protected liberty interest. *See also* Lombard v. Board of Education, 502 F.2d 631 (2d Cir. 1974), cert. denied, 420 U.S. 976, 95 S.Ct. 1400, 43 L.Ed.2d 656 (1975). This interest is similar to Fuentes' interest, since some of the charges against him concern his reputation. *See also* Wisconsin v. Constantineau, 400 U.S. 433, 437, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971). It is not clear, however, that Fuentes' property interests are implicated. The *Goss* Court found a property interest in a student's entitlement to a public education, an interest plainly not present here. Moreover, it is not apparent that other cases decided by the Supreme

Court show that *Fuentes* has been deprived of property. *See* Perry v. Sindermann, 408 U.S. 593, 601, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972) ; Board of Regents v. Roth, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).

21. Section 2590–j(7) was recently found violative of procedural due process because, *inter alia,* it does not provide for the local school board to state in writing the reasons for its decision. Hall v. Ambach, (Sup.Ct., Albany Cty. Special Term, July 26, 1974). Since the *Hall* court's grounds for invalidating section 2590–j(7) are not asserted here by Fuentes, we need not consider whether they would warrant invalidating the § 2590–j (7) component of Fuentes' administrative procedure. The *Hall* court followed the rationale of a three-judge district court in Kinsella v. Board of Education, 378 F.Supp. 54 (W.D.N.Y. 1974), which found unconstitutional the provisions of § 3020–a of the Education Law, a provision similar to § 2590–j (7).

22. We need not decide whether Fuentes waived his claims to procedural due process by bargaining for an administrative procedure not accorded to other school superintendents, which he now claims is unconstitutional. However, we believe such an argument might have merit. *See* D. H. Overmyer Co. v. Frick, 405 U.S. 174, 185, 92 S.Ct. 775, 31 L.Ed.2d 124 (1972). *See also* Brady v. United States, 397 U.S. 742, 756–58, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970).

members of the school board are prosecutors, investigators, witnesses, and judges in the same case. Fuentes argues that the board has brought the charges against him and has personally investigated some of the charges; that at least defendant Roher has testified against Fuentes in the administrative hearing; and that the board members will pass in the first instance on the charges against Fuentes following Cowan's hearing and report. This administrative combining of functions, Fuentes urges, is constitutionally impermissible because procedural due process requires the right to a hearing before an impartial tribunal.

Although the Supreme Court has held that due process requires a hearing before an impartial tribunal, Goldberg v. Kelly, 397 U.S. 254, 271, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), it has not declared the extent to which a combination of functions in one decisionmaker in an administrative proceeding is permissible. In Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), the Supreme Court considered the argument that the plaintiff school teacher had been wrongly dismissed by a school board for having written a letter that criticized the board's appropriation of school funds. While the Court held that dismissal on such grounds violated plaintiff's first and fourteenth amendment rights, it specifically declined to hold unconstitutional the procedure followed by the board, in which the board —the victim of the plaintiff's remarks —also served as prosecutor and judge. The Court declined to rule on this procedure because it had not been raised in the prior state proceedings. However, it commented, "[W]e do not propose to blind ourselves to the obvious defects in the factfinding process occasioned by the board's multiple functioning vis a vis appellant." 391 U.S. at 579 n. 2, 88 S.Ct. at 1740. (citations omitted).

One year before *Pickering* was decided, the Second Circuit held in a case involving the dismissal of a cadet from the United States Merchant Marine Academy that where a member of the panel that awarded him demerits allegedly had participated in the investigation against him, the cadet was entitled to show that he had been deprived of a fair hearing under the due process clause. Wasson v. Trowbridge, 382 F.2d 807, 813 (2d Cir. 1967). The court thus held that the inclusion on the hearing panel of persons having some previous contact with the incident did not make the hearing unconstitutional per se. *Accord,* Blanton v. State University of New York, 489 F.2d 377 (2d Cir. 1973). Thus, in the absence of evidence that the board members could be presumed to be biased against plaintiff Fuentes, we conclude that it is not unconstitutionally impermissible for the board members to draw up charges against Fuentes which they believe to be true, and then pass on those charges at a later date.

■ Moreover, even assuming that the board members are biased, if an avowedly neutral decisionmaker is provided at a later stage of the administrative procedure, "a previous flaw, if any, becomes immaterial." Blanton v. State University of New York, *supra,* at 386. (citation omitted). *But see,* Ward v. Village of Monroeville, 409 U.S. 57, 93 S.Ct. 80, 34 L.Ed.2d 267 (1972); Wall v. Optometric Assoc., Inc., 379 F.Supp. 175, 187–90 (N.D.Ga.1974). Here, if the board is found to be biased, such bias is vitiated as a constitutional matter by the right of appeal to the city board, and possibly the chancellor,[23] both concededly neutral. Since the city board can reverse the findings of the local board, and will have full access to the record developed at the administrative hearing, we cannot agree with Fuentes that the combination of allegedly inconsistent functions in the board members violates his rights to due process.

23. *See note 13, supra.*

### B. Bias

#### 1. Actual or Presumed?

In assessing whether the alleged bias of Cowan and the majority members of the school board is constitutionally objectionable, we must first determine whether the standard is one of actual bias or one of presumed bias. In discussing whether it was permissible for a mayor serving as traffic judge to retain a pecuniary interest in disposing of cases, the Supreme Court declared that "the test is whether the mayor's situation is one 'which would offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear, and true between the state and the accused . . . .'" Ward v. Village of Monroeville, 409 U.S. 57, 60, 93 S.Ct. 80, 83, 34 L.Ed.2d 267 (1972) *quoting* Tumey v. Ohio, 273 U.S. 510, 532, 47 S.Ct. 437, 71 L.Ed. 749 (1927). This case appeared to apply a standard of possible, rather than actual bias, in a criminal or quasi-criminal setting. In Wasson v. Trowbridge, *supra,* the Second Circuit indicated that in a civil context the standard was whether members of the hearing panel had such prior contact with the case that they could be "presumed to have been biased." 382 F.2d at 813. *Accord,* Blanton v. State University of New York, *supra,* 489 F.2d at 386. *See also* American Cyanamid v. F.T.C., 363 F.2d 757 (6th Cir. 1966) ("appearance of. bias" is objectionable). *But see* Simard v. Bd. of Educ. of Town of Groton, 473 F.2d 988 (2d Cir. 1973) (no due process violation unless showing of actual bias).

The thrust of these cases, then, is that a presumption of bias or an appearance of bias is sufficient to show a violation of due process.

#### 2. Marcy Cowan

As described above, Cowan has served as the hearing examiner pursuant to the provisions of § 2590–j(7) of the New York Education Law. He was appointed by the defendant majority members of the community school board to hold hearings on the charges leading to Fuentes' suspension. After holding hearings, Cowan or his successor will report to the community school board, which may either accept, reject, or modify his findings.[24]

Plaintiff Fuentes alleges that Cowan is unfit to serve as a hearing examiner because he has both a pecuniary interest in the proceedings and a personal bias against Fuentes. Specifically, Fuentes contends that Cowan has a personal bias against him because of his allegedly close ties with the United Federation of Teachers. According to Fuentes, all hearing examiners are chosen from a list approved by the United Federation of Teachers, as required by the U.F.T.'s contract with the Board of Education. (Plaintiff's Exhibit # 1). Fuentes contends that because of the close association between the U.F.T. and the majority school board members, the U.F.T.'s role in approving the list of potential hearing examiners renders all such hearing examiners unconstitutionally biased in this case. Assuming *arguendo* that the U.F.T. does approve the list of potential hearing examiners, we do not believe that this fact alone requires us to conclude that Cowan is biased.

Cowan testified that he had applied several years ago to be placed on

---

24. Although Cowan has resigned as hearing examiner, see notes 4 and 18, *supra,* we do not believe the delays to date in the administrative hearings indicate that the procedure is neither speedy nor adequate. Fuentes himself requested delays when he obtained new counsel and when there was an illness in his family. Moreover, Fuentes' present attorney in the administrative proceedings requested that hearings be limited to two evenings per week between January 6 and January 30 due to another commitment. Ironically, Fuentes' prior attorneys had urged last fall that twice weekly hearings before Cowan should take place more frequently.

the list of hearing examiners, and that he previously served as hearing examiner in three instances where grievances had been filed by parents against local school boards. Cowan testified that, prior to the commencement of the proceedings before him and in this court, he knew nobody on the local school board, and his only familiarity with Fuentes stemmed from having seen his picture on television and in the newspapers. In addition, he testified that he was not aware of the nature of the problems in School District No. 1 until he was chosen as hearing examiner. (Tr. 26). Cowan also stated that he has been associated with a law firm during the past six years, and that prior to that he was employed for 17 years as principal of an elementary school in Brooklyn, and for three years before that as assistant principal. (Tr.31). Cowan testified that while he had formerly been a member of the U.F.T., he had terminated his membership when he became a supervisor, apparently some 26 years ago. Cowan indicated that he severed his relationship with the U.F.T. to avoid a potential conflict of interest, since as a supervisor he might have difficulties with some teachers, who would be defended by the U.F.T. (Tr.41). Moreover, Cowan testified that he was only a "paper member" of the U.F.T., or its precursor the Teachers Guild; he paid dues but was otherwise inactive. (Tr.44). Cowan further stated that in the early 1960's when he helped organize a union of school supervisors, he met with U.F.T. officers to discuss whether they would go along with the application for a charter from the American Federation of Teachers. (Tr.58). However, Cowan declared that he knows none of the present U.F.T. officers. (Tr.49).

At one point during the hearing, Cowan testified that "Mr. Fuentes should either be sustained or not sustained, as the facts may determine." (Tr.29–30). This evidence convinces us that Cowan neither is actually biased nor presents an appearance of bias. We found his testimony to be credible, and we believe that he will be able to fairly conduct the hearing regarding the charges against Fuentes. We reaffirm our conclusion of November 12 that Cowan has "indicated an ability to act on this matter impartially." (Tr.735).

■ Our conclusion remains the same despite the allegations of Fuentes that Cowan has a pecuniary interest in the administrative proceedings and therefore is unqualified to serve as hearing examiner. Fuentes notes that the hearing examiner receives a per diem allowance of $82. He then goes on to suggest that because of the purported interest of the U.F.T. and the local school board in the instant matter, Cowan will not be selected as a hearing examiner in the future unless he renders a decision favorable to the local scheool board. This alleged ground of bias must be summarily dismissed, since Cowan testified that he has been selected on several occasions to be a hearing examiner, despite the fact that he has previously rendered decisions against local school boards.

### 3. Other Witnesses

■ Fuentes contends that defendants Adolph Roher, Richard Lee Price and the other defendant majority members of the local school board are actually biased against him and have given the appearance of bias against him. This bias is fatal, Fuentes contends, because the board members who brought the charges against him investigated some of the charges, testified against him at the administrative proceedings, and will later pass on those charges after the administrative hearing is completed. Fuentes urges that even if we find that Cowan is not biased, the alleged bias of the local school board members renders the administrative procedure unconstitutional since they will pass on the charges against Fuentes.

Adolph Roher, chairman of Local School Board Number One, testified that he believes the educational system in Community School District One has

failed to teach children adequately as a result of racial antagonism, boycotts, and sit-ins. (Tr.105). However, he indicated that he does not know whether Fuentes has been responsible for these disruptive activities, and said he never has blamed Fuentes for them. (Tr.106).

Roher discussed in detail his relationship with the Committee for Effective Education ("CEE"), a local organization which endorsed his candidacy in 1973 and 1974. According to Roher, the organization is headed by Abe Ruda, the U.F.T. district representative in School District Number One. Roher testified that he had no personal knowledge of having received campaign funds from CEE, but acknowledges that he knew the group distributed campaign literature on his behalf.

The nature of this literature and the defendants' relationship to it apparently is one of the primary reasons for Fuentes' contention that the school board members are biased against him. This literature consists of a series of campaign leaflets published by CEE in 1973 and 1974 endorsing the defendant majority members of the school board and others who ran on a slate with them. With few exceptions, the leaflets presented to the court attack Fuentes, and one accuses him of being anti-Semitic, anti-black, anti-Italian, and even anti-Puerto Rican. Another states that Fuentes had referred to the teachers in the school district as "a new pimp class, breeding on the dead minds of children." Still, another declares, "It's not too late —yet—on the Lower East Side. We still have time to stop the racists known as the Fuentes Band."

Roher acknowledged that the Committee for Effective Education distributed campaign literature on his behalf, but maintained that the CEE didn't show him the literature in advance or consult him about how it ought to be distributed. Roher stated that he didn't pay much attention to the CEE campaign leaflets, and "never evaluated them." He also stated that he made no attempt to withdraw any of the leaflets in question or to disassociate himself from them. However, Roher declared that he had never heard Fuentes refer to teachers as "a new pimp class," and had no basis to conclude that the schools in District One are permeated with racism, as is alleged in one CEE brochure. He also testified that he disbelieved charges in one leaflet that Fuentes "has brought gangs of young toughs into our schools" and that Fuentes has made "racist, anti-Semitic, anti-Puerto Rican, anti-Black, anti-Italian slurs." Roher did say that Fuentes called him a liar on one occasion, and stated that he believed some of the charges against Fuentes were true. However, he also stated that he would look into the record of the hearings developed by Cowan—with Cowan's recommendations—before deciding how he would vote on the charges against Fuentes.

On the basis of this record and our observation of Roher on the witness stand, we find his testimony credible, and we conclude that Roher is not actually biased against Fuentes. Moreover, we do not believe there is sufficient evidence of an appearance of bias to give rise to a violation of procedural due process. We believe Roher will fairly assess both the recommendations of the hearing examiner and the record of the administrative hearing before deciding how to vote on the charges against Fuentes.

Like Roher, Richard Lee Price was endorsed by CEE as a candidate in both 1973 and 1974. Unlike Roher, however, Price objected to some of the literature put out by CEE in 1974, and wrote the organization a letter requesting that he be shown any campaign literature endorsing him before it was circulated. In addition, Price testified that he spoke with some members of CEE and told them that he hoped the election literature in 1974 would not be of the same nature as the literature for the 1973 campaign. Price declared that he had formed tentative thoughts on one charge

against Fuentes, and that he knows that Fuentes has committed other acts which are the subject of the charges against him. However, he said he does not know if there are possible explanations which might justify Fuentes' conduct. Like Roher, Price testified that he would not draw any final conclusions until he had an opportunity to study the record developed by Cowan as well as Cowan's recommendations.

On the basis of his testimony in court, we also find Price to be a credible witness. In particular, we believe that his letter to CEE requesting he be shown in advance its campaign literature endorsing him evinces an intent on his part to proceed fairly during the election campaign. We believe this spirit of fairness will carry over to his deliberation of the charges against Fuentes, and that he, like Roher, will fully consider the record of the administrative hearing and the hearing examiner's recommendations before deciding how to vote on the charges against Fuentes. Consequently, we conclude that Price is not actually biased against Fuentes and that there is insufficient evidence of an appearance of bias to constitute a violation of Fuentes' rights to procedural due process.

In addition to Roher and Price, Hyman Silverglad, an unsuccessful school board candidate, testified. Silverglad, who had been backed by CEE, explained that Roher had told him on one occasion that he was opposed to Fuentes, and that Roher believed Fuentes was "a manipulator." Testimony was also heard from defendant Donald Brown, a member of the school board from May, 1973 until the elections in May, 1974. Brown denied that the majority members of the board had conspired to oust Fuentes even before the charges were drawn up. He denied that he had participated in

strategy sessions with CEE persons and candidates. He also denied that he had ever decided with other candidates to renew the 1973 charges together with some new ones. These denials were contradicted, however, by Brown's statements in an interview with one Wayne Barrett, which was conducted shortly before his testimony.[25] Fuentes urges us to believe Brown's statements during the interview, and to disbelieve his testimony in court. This we cannot do. Since Brown's testimony in court was almost wholly contradicted by his interview statements, we find it difficult to credit his in-court statements. Moreover, to the extent that Brown's interview testimony conflicted with testimony by Price and Roher, we find the latter to be more credible. We base this conclusion on our first-hand observations of Roher and Price, and our view that their testimony was credible; to the extent that we observed Brown first-hand, by contrast, he demonstrated that his testimony was not at all credible.

We find on the basis of the record before us that there is insufficient evidence to warrant the conclusion that the defendant majority members are actually or apparently biased against Fuentes. While they may believe that some of the charges against Fuentes are true, it is inconceivable that they could have brought any charges against him without believing that there was a reasonable chance that the charges were well-founded. Despite such initial beliefs, however, Roher and Price testified that they could and would examine both the record developed by Cowan and his recommendations before determining how to vote in regard to the charges pending against Fuentes. Furthermore, as we have noted, we found both Roher and Price to be credible witnesses, and thus

---

25. Barrett, a journalist and friend of Fuentes, interviewed both Brown and Silverglad shortly before their testimony in court. He told them that he wanted to speak to them to gather information for a book he is writing which will deal in part with the events in School District Number One, but he declined to inform them that he anticipated that his interviews would be used, directly or indirectly, in this action.

find believable their own assertions that they will be able to judge the charges against Fuentes fairly and impartially.

We also find that while anti-Fuentes literature was distributed by CEE in both the 1973 and 1974 election campaigns, the association of defendants Roher and Price with the statements in that literature was minimal. Perhaps it would have been advisable for them to have completely disassociated themselves from such literature, but we cannot conclude that their failure to do so was an indication of their personal bias against Fuentes. Rather, we find it reasonable to conclude that the CEE leaflets were issued during the heat of the school board campaigns, and did not represent any personal animus toward Fuentes. Moreover, we find there is insufficient evidence to conclude that there is an appearance of bias against Fuentes by the defendant majority members of the school board, especially considering credible disavowals by Roher of several of the anti-Fuentes statements contained in the campaign literature. We also believe that an appearance of bias is not created by the fact that the school board members will pass on the credibility of charges which involve their relations with Fuentes. We so conclude because the charges will first be heard before an impartial hearing examiner who will present them with a record and with recommendations, and because the contract provides that the school board's own findings may be reviewed by the city board. Consequently, it is not likely that the board will simply ignore the evidence before it.

We also note that since only defendant board members Roher and Price testified, we have no direct evidence on which to believe that the other defendant majority school board members harbor any personal animosity towards Fuentes or are biased against him in any way.[26]

## VI. *Enjoining Fuentes' Suspension*

Fuentes seeks to enjoin his suspension on the ground that such suspension was effectuated in contravention of his first and fourteenth amendment rights. Since we have concluded that the administrative process should be exhausted, we may now consider whether Fuentes' suspension should be enjoined. In Arnett v. Kennedy, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974), the Supreme Court held that a government employee's rights to procedural due process could be adequately protected by an administrative hearing after the employee's dismissal. *A fortiori,* then, any rights which Fuentes may have to procedural due process will be adequately protected by an administrative hearing following the lesser action of a suspension with pay.[27]

Since we deny Fuentes' motions to enjoin the administrative process and to enjoin his suspension, and find against him on the merits in all respects, we must dismiss his claim pursuant to 42 U.S.C. § 1983.

## VII. *Pendent Claims*

Having dismissed the federal claim, we now consider whether to entertain the pendent state claims—i. e., the action by Fuentes against the defendants for defamation, and the counterclaim by defendant Price against Fuentes for defamation.

The federal courts have judicial power to decide pendent state claims when the state and federal claims constitute one constitutional case and "derive from a common nucleus of operative fact." United Mine Workers v. Gibbs, 383 U.S.

26. Fuentes is free to demonstrate at a later date that the defendant majority school board members are actually or apparently biased against him. Such a showing should only be made after Fuentes is dismissed or fired, and upon the presentation of additional evidence tending to demonstrate bias against him.

27. We have also found that Fuentes has suffered no irreparable harm as a result of his suspension with pay. *See* pages 1233–1234, *supra.*

715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966). This judicial power exists in the instant case, since the pendent state claims are derived from Fuentes' contract and the charges against him, which are the subject of the federal action.

Even when judicial power to decide pendent claims exists, such power need not be exercised, for the doctrine of pendent jurisdiction is one of discretion. And, "if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." United Mine Workers v. Gibbs, *supra*, at 726, 86 S.Ct. at 1139 (footnote omitted). Since we have dismissed the federal claim, we also dismiss the pendent state claim and counterclaim.

VIII. *Federal Counterclaims*

Defendant Price alleges in two of his counterclaims that Fuentes violated his first and fourteenth amendment rights by wrongfully bringing the lawsuit which caused this court to order a special school board election in May, 1974. *See* Coalition for Education in District One v. Board of Elections, City of New York, 370 F.Supp. 42 (S.D.N.Y.), aff'd 495 F.2d 1090 (2d Cir. 1974). As a result of that lawsuit, Price contends, he was improperly prevented from serving the full two-year term to which he originally had been elected. Assuming *arguendo* that Fuentes was responsible for bringing that lawsuit, we believe that Price's claim is without merit, since one may not be penalized for bringing a lawsuit, directly or indirectly, in defense of one's constitutional rights. This is especially so where one has brought an action based upon the constitution and has been vindicated by the courts. Price's federally based counterclaims are therefore dismissed.

For the reasons stated above, this action is dismissed.

So ordered.

SUPPLEMENTAL OPINION

On March 18, 1975, this court issued an opinion dismissing the instant action brought by Luis Fuentes against the members of local Community School Board Number One to enjoin his suspension as school district superintendent. However, the court pointed out that it had been advised that administrative hearing examiner Marcy Cowan resigned in early February and that as of February 28 no replacement had been chosen. The court went on to note that "[t]he failure of defendants to appoint promptly a new hearing officer obviously bears importantly upon the adequacy of the administrative procedures to provide plaintiff with a speedy administrative remedy. If this situation continues, the court will be disposed to consider an appropriate remedy."

Since the opinion was issued, this court has met on several occasions with the parties in an effort to see that a new hearing examiner is appointed. The court also requested that the defendant majority members of the school board apprise the chancellor of the need to appoint a hearing examiner and the inability of the board to appoint one, attributable in part to the abstention of a board member who was originally part of the majority which voted to prefer charges against Fuentes.

The Chancellor has taken an active interest in the problem, but to date has been unable to persuade the board members to agree on the appointment of a new hearing examiner. In view of the impasse which has persisted to this day, this court, exercising its inherent equitable powers, directs the defendant members of local community School Board Number One to appoint a hearing examiner on or before Monday, April 7, 1975, and, in the event the board cannot reach agreement on appointing a hearing examiner, this court directs the board to request that the Chancellor appoint a hearing examiner on or before Friday, April 11, 1975.

This action is bottomed on the equitable maxim that "equity regards and treats that as done which in good conscience ought to be done." Pomeroy, *Equity Jurisprudence* § 364 (5th Ed. 1941). This principle is premised on the notion that when one party has a right to have another party perform some act, there is a corresponding duty on that other party to so perform. Here, Fuentes has a right to a hearing on the charges pending against him; because of our decision, this hearing should take place before an administrative hearing examiner. The defendant board members have a corresponding duty to appoint a hearing examiner to ensure that Fuentes' right to a speedy administrative determination of the charges against him will not be frustrated. This court's action will assure that Fuentes promptly receive a fair hearing. As one court noted in a somewhat different context, "Courts and agencies properly take cognizance of one another as sharing responsibility for achieving the necessities of control in an increasingly complex society without sacrifice of fundamental principles of fairness and justice." *Niagara Mohawk Power Corp. v. FPC*, 126 U.S.App.D.C. 376, 379 F.2d 153, 160 (1967) (footnote omitted). *See also Montana Power Company v. FPC*, 330 F.2d 781 (9th Cir. 1964).

Our action today is analogous to the equitable power exercised by a court in appointing new trustees when those originally named refuse to accept or resign. *See* Pomeroy, *Equity Jurisprudence,* § 1087 (5th Ed. 1941). In such a situation, the court exercises its inherent equitable power to appoint new trustees whenever such action is necessary to protect the rights of the beneficiaries. Here, by analogy, this court must exercise its equitable power to protect the right of Fuentes to a prompt administrative hearing.

Therefore, it is hereby

Ordered that the defendant members of local community School Board Number One appoint a hearing examiner on or before Monday, April 7, 1975; in the event that the board members for any reason fail to do so, it is

Ordered that the defendant board members request the Chancellor to appoint a hearing examiner on or before Friday, April 11, 1975, with such request to be made on or before Tuesday, April 8, 1975.

So ordered.