Luis **FUENTES**, Plaintiff-Appellant,

v.

Adolph **ROHER** et al.,
Defendants-Appellees.

Georgina Hoggard et al.,
Defendants-Appellants.

Nos. 1077, 1137, Dockets 75–7213, 75–7224.

United States Court of Appeals,
Second Circuit.

Argued May 14, 1975.

Decided May 29, 1975.

380

Herbert Teitelbaum, New York City
(Jack John Olivero, Kenneth Kimerling,
Richard J. Hiller, Puerto Rican Legal
Defense & Education Fund, Inc., New
York City, on the brief), for plaintiff-appellant.

Arnold Rothbaum, Brooklyn, for defendants-appellants Hoggard, Wong, Ramos, and Barreto.

Doron Gopstein, New York City (W.
Bernard Richland, Corp. Counsel of the
City of New York, New York City, of
counsel, Steven C. DeCosta, New York
City, on the brief), for defendants-appellees.

Before KAUFMAN, *Chief Judge,* OAKES, *Circuit Judge,* Jameson, *District Judge.\**

IRVING R. KAUFMAN, *Chief Judge* :

Although one scarcely any longer hears of the truant officer, the reason is not because the Golden Rule has rendered the hickory stick obsolete in school administration. It might in fact be suggested that the federal courts have taken over that ogre's duties, and numerous others as well, from regulation of hair styles, *Stevenson* v. *Board of Education,* 426 F.2d 1154 (5th Cir.), *cert. denied,* 400 U.S. 957, 91 S.Ct. 355, 27 L.Ed.2d 265 (1970), to supervision of suspensions, *Goss* v. *Lopez,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975), from review of a teacher's right to refuse to pledge allegiance to the flag, *Russo* v. *Central School District No. 1,* 469 F.2d 623 (2d Cir. 1972), *cert. denied,* 411 U.S. 932, 93 S.Ct. 1899, 36 L.Ed.2d 391 (1973), to oversight of the student's right to wear an armband. *Tinker* v. *Des Moines Independent Community School District,* 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). This case presents us with the somewhat more complex, though no less unwelcome, task of meddling in an intramural fray involving not unruly students, but the board of education and the community school district superintendent.

Luis Fuentes, the community superintendent, appeals from the denial of his motion for a preliminary injunction and the dismissal of his underlying action, which charged that his suspension and the board's efforts to secure his discharge violated his fourteenth and first amendment rights of free speech and procedural due process. Several members of the board also join him in seeking to overturn a subsequent order of the district court directing the appointment of a hearing examiner to review the charges made against Fuentes. We affirm; we also modify and remand in the respects indicated below.

I. FACTS

A. *Background.* Luis Fuentes, superintendent of Community School District Number One on the lower east side of Manhattan, signed a contract of employment with the community school board on October 31, 1972. The contract, due to expire on July 31, 1975, delegated to Fuentes

the duties specified in Sections 2590-(f) [2590–f] 2590–(j) [2590–j] (7) and (8) of the New York Educational Law [McKinney's Consol.Laws, c. 16], and such other duties as the School Board shall hereafter assign, subject in all the foregoing instances to the policies, procedures and specific instructions of the School Board; or any of its duly authorized subcommittees. . . .

Unfortunately, as appellant's brief indicates, School Board politics in District One has been heated, vitriolic and often slanderous, and Fuentes's tenure has been a stormy one. The dispute which eventuated in this action began after the school board election in May of 1973, which was essentially a struggle between two factions: the Coalition for Education in District One, whose candidates—mostly minority group members—were drawn from the incumbent board, and the Committee for Effective Education [CEE], an organization supported by the United Federation of Teachers and sponsoring one black and eight white candidates. The bitterly fought election resulted in the choice of six CEE candidates (Adolph Roher, Richard Lee Price, Donald S. Brown, Lyle Brown, Saul Mildworn, and Carolyn Kozlowsky), and three Coalition members. Several months after the new board took office, the CEE board members prevailed on a vote taken on October 16, 1973, to suspend Fuentes without pay. Among the 31 charges that the board found to support the dismissal (discussed more fully *infra* at B.) was an allegation that Fuentes had "engaged in partisan political conduct during the campaign for the election . . .."

\* Of the District of Montana, sitting by designation.

The majority board members were not, however, alone in their dissatisfaction with the conduct of the May election. Less than one month before Fuentes's suspension, on September 18, 1973, the Coalition—along with several unsuccessful candidates and members of minority groups—had begun an action in the United States District Court for the Southern District of New York, claiming that various acts by employees of the Board of Elections had resulted in a discriminatory impact on the rights of minority voters. *Coalition for Education in District One* v. *Board of Elections, City of New York*, 370 F.Supp. 42 (S.D.N.Y.), aff'd, 495 F.2d 1090 (2d Cir. 1974). Although Fuentes was not a party to the action, the plaintiffs in that case succeeded on October 19, 1973 in getting an injunction against his suspension. Fuentes's original complaint in this action, charging interference with his rights of free speech and association, together with violations of New York state law, was filed on December 21, 1973, but because of the outstanding order in the *Coalition* case no action was taken on Fuentes's complaint filed on December 21. This Court ultimately sustained Judge Stewart's finding of discrimination in connection with the 1973 election, and ordered new elections which took place on May 14, 1974. 495 F.2d 1090 (2d Cir. 1974).

The court-ordered election returned five CEE candidates (Roher, Price, and Kozlowsky, as well as Jerome Goodman and Martin Rubin), and the four Coalition members who are nominal defendants in this case (Georgina Hoggard, Henry Ramos, Carmen Barreto, and Janice Wong). On August 8, 1974 the new board took up its unfinished business. By resolution (5–0, with four abstentions) it preferred the 31 charges referred to earlier against Fuentes and added ten new allegations. Fuentes was suspended with pay pending a hearing and determination of these charges. Deputy superintendent Annie Mersereau was appointed acting superintendent, and Fuentes was directed to remain away from the school district offices until the hearing was concluded.

B. *The Charges.* Since the nature of the charges against Fuentes are crucial to the issues raised on this appeal, we deem it appropriate to mention at least the more significant ones. Charge I, dealing with "Improper Commitment and Expenditure of Public Funds," contains among its four specifications the charge that Fuentes, without the board's knowledge, permitted the successful bidder for the school lunch program contract to withdraw in May of 1974, at a cost to the district of some $24,000. Charge II, "Deceit, Insubordination and Conduct Prejudicial to the Good Order of the District," states among other things that Fuentes threatened violence to members of the board who did not make "wise" decisions; that he called board chairman Roher a "liar" in the course of one board meeting, and at another stated that he was "through dealing with [Roher] as a human being"; it also alleges that in May of 1974 Fuentes "engaged publicly in partisan political activity on behalf of certain candidates for election to the School Board and in opposition to other candidates, certain of whom were thereafter elected to the board, thereby reducing and impairing his ability to function as an employee of said Board and its duly elected members." Charge III, "Breach of Employment Contract Dated October 31, 1972," alleges among other specifications that during July, August, September and October of 1973 Fuentes made more than 60 appointments to teaching positions in the district without informing the board, contrary to paragraph (3)(b) of his contract. Charge IV, "Insubordination, Neglect of Duty and Inefficiency," states *inter alia* that Fuentes ignored the board's instruction to investigate and report assaults on children and a parent at P.S. 110, and failed to carry out an order to conduct an investigation of charges of anti-Semitism at J.H.S. 22. Charge V, "Insubordination," specifies that Fuentes refused to carry out the board's order to discharge two individuals in July and August of

1973. Charge VI dealt with miscellaneous sorts of "Misconduct." Charge VII, which together with the single statement in Charge II concerning political activity forms the basis for Fuentes's first amendment claim, states that during April of 1973 he engaged in "partisan electioneering by the use of a sound truck," and that he "engaged in partisan political conduct during the campaign for the [1973] election. . . ."

C. *Hearing Procedures.* The state of New York is quite protective of the rights of tenured teachers and supervisors. Before they may be dismissed a full evidentiary hearing must be afforded. N.Y. Education Law § 2590–j(7) (McKinney's Consol.Laws, c. 16, 1970), 2573(6) & (7) (McKinney Supp.1974–75). Higher-ranking educational officials, however—community superintendents and, indeed, the chancellor of the city school system—are removable simply "for cause." *Id.* § 2590–e(1)(a), § 2590–h (McKinney Supp.1974–75).

Despite the provisions of the Education Law, Fuentes's contract specified that dismissal should only take place upon a two-thirds vote of the local school board, and that

> Cause shall consist only of those matters enunciated in subdivision 7(b) of Section 2590–(j) [2590–j] of the Education Law. School Board, except as they shall be inconsistent herewith, shall be subject to the procedural rules of subdivision 7 of Section 2590–(j) [2590–j] of the Education Law, provided that school board shall have such powers and duties as are therein prescribed for the Community Superintendent.

Fuentes was thus given by contract the procedural protections afforded tenured teachers and supervisors. These include rights to notice, retained counsel, the opportunity to call and to cross-examine witnesses, and a right of appeal on the record from the community board to the city board—and thence to the State Commissioner of Education, N.Y. Education Law § 310 (McKinney 1969)—in the event of an adverse determination.

The contractual provision giving the board the powers usually held by the superintendent (where the dismissal of a teacher or supervisor is at issue) implies that the community board should initiate the charges, § 2590–j(7)(b), as well as appoint a trial examiner "from a panel of competent persons maintained by the chancellor," § 2590–j(7)(f), and act on the report of the trial examiner made after a hearing, by rejecting, confirming, or modifying it by a vote of the majority of all members of the board. *Id.* After its August 8, 1974 suspension of Fuentes, the board directed a hearing to be held on August 28, and appointed a hearing examiner, one Marcy Cowan, from a list approved by the United Federation of Teachers. Cowan, who had served several times as a hearing examiner in other cases, had for six years been associated with a law firm, and for 17 years prior to that had been the principal of an elementary school in Brooklyn. Although once a member of the United Federation of Teachers, he had severed his relations with the UFT 26 years before, upon becoming a supervisor in the New York school system. The board also appointed an attorney, Richard Aronstein, to prosecute the charges before the hearing examiner.

D. *Revival of the Present Action.*

Immediately after the board's August 8 resolution there ensued a procedural variation of "hide-and-go-seek" which is only of tangential interest to this case, the salient facts of which we set forth in the margin.[1] Suffice to say that, having

---

1. Despite the board's August 8 resolution, Fuentes returned to work the following day. The board thereupon obtained an order restraining Fuentes from continuing to perform his former duties, from Justice Bernard Nadel of the New York Supreme Court on August 12, 1974. Fuentes attempted to remove that action to the United States District Court for the Southern District of New York, and to obtain from Judge Owen—in connection with his own case, which had been pending before Judge Stewart since the preceding December 21—a temporary restraining order against his suspension. After two days of hearings, Judge

been denied one request in federal court for an order restraining his suspension, Fuentes failed to appear at the hearing which had been scheduled for August 28, 1974. His counsel advised Cowan, the hearing examiner, that "pending litigation in both federal and state courts related to the matter here makes such a meeting inadvisable at the present time." At about the same time Fuentes revived this action, which had lain dormant since December of 1973, by filing a supplemental complaint. He sought preliminary and permanent injunctions against his suspension, pursuant to 42 U.S.C. § 1983 (1970), on the grounds that it infringed his rights of free speech and procedural due process. Fuentes also contended that the suspension contravened the terms of his 1972 contract with the board, as well as the rights guaranteed him by N.Y. Education Law § 2590 *et seq.* Finally, he sought damages of $350,000 for defamation in connection with the charges brought by the board in October of 1973 and August of 1974. Judge Stewart denied the motion for a preliminary injunction against the suspension on September 4, 1974, finding that the contractual procedures were fair, and that there was no likelihood of irreparable injury to Fuentes.

Quite undeterred by a lengthening succession of failures Fuentes, after attending one session of the rescheduled administrative hearing, requested a pre- liminary injunction against the state administrative proceedings, charging that they would not provide an expeditious determination of the board's allegations,[2] and that the board was biased and had prejudged his case. Judge Stewart granted a temporary restraining order on October 11, 1974, but ten days later refused to continue the stay, permitting the administrative hearing to go forward.

On October 25 the district court began an evidentiary hearing on Fuentes's motion to stay the state proceedings. After taking extensive testimony on the issue of bias from, among others, hearing examiner Cowan, chairman Roher, and Richard Lee Price, Judge Stewart orally denied the motion on November 12, 1974. The diffusion and confusion of procedural moves continued on, for shortly thereafter Fuentes moved for reargument, which was granted on December 2, 1974. On March 18 of this year the district judge filed his opinion denying once again the motion for an injunction against the administrative proceedings. Judge Stewart also dismissed Fuentes's underlying action as well at that time, including the claims under state law for breach of contract and for defamation.

E. *Subsequent Proceedings Below.*

On March 19, 1975, the day after the dismissal, Fuentes moved again for reconsideration. The reason alleged was

---

Owen remanded the removed action to the state court, but ruled that the restraining order granted to the board by Justice Nadel should continue in effect as an order of the federal district court as well. When the action was returned to the state court, the board sought to have its restraining order replaced by a preliminary injunction. Although Fuentes succeeded in obtaining an adjournment, the restraining order was continued in force. A preliminary injunction was eventually granted on October 11, 1974, and affirmed by the Appellate Division on December 24, 1974. N.Y.L.J., December 24, 1974, p. 2, col. 3.

As Fuentes was fighting on this front, the Coalition members of the board pursued administrative appeals to challenge Fuentes's suspension. Both the Chancellor (on August 19, 1974) and the City Board of Education (on September 4, 1974) found that the procedures at the August 8 meeting comported with the New York statutory and administrative requirements. The decision of the City Board was subsequently upheld by the State Commissioner of Education, *Appeal of Henry Ramos*, 14 Ed.Dept.Rep.—(Decision No. 8995, April 18, 1975).

2. Fuentes's complaint about the speed of the administrative procedures up to that point was somewhat disingenuous. As Judge Stewart noted in his March 18, 1975 opinion, hearing examiner Cowan indicated on September 24 that he would hold two-hour hearings twice weekly, and this suggestion met with no resistance from Fuentes's attorneys. Moreover, on October 3, 1974 Cowan wrote to Fuentes's attorneys that he was willing, if they desired, to hold "full day session[s] as often as the parties desire in order to expedite things."

that Marcy Cowan, the hearing examiner, had been forced to withdraw for reasons of health during the preceding month, and it appeared that the administrative hearings would not be able to go forward. To complicate this jumble of proceedings, charges and countercharges still further, Carolyn Kozlowsky—one of the CEE candidates returned in the 1974 election—had recently realigned herself with the Coalition board members, who favored dropping the charges against Fuentes and discontinuing the hearing. It also appeared that Henry Ramos, one of the Coalition board members, had left the state indefinitely, and had missed three consecutive public meetings and a closed session of the board. On April 2, 1975 Adolph Roher, the chairman of the community board, notified New York City School System Chancellor Irving Anker that Ramos had vacated his office pursuant to N.Y. Education Law § 2590–c, subd. 6(34)(a)[3] and the board's bylaws. Thus, deadlocked at 4–4, the board was unable either to dismiss the charges against Fuentes or to appoint a new examiner to continue the hearings. In an effort to end what must have been frustration piled on frustration, the Judge, attempting to afford a prompt hearing, on April 3 directed the board either to appoint an examiner to replace Cowan by April 7, 1975, or if it were unable to reach an agreement by that date, to request Chancellor Anker to do so on or before April 11.

Fuentes filed a notice of appeal from Judge Stewart's March 18 order dismissing his action and both he and the Coalition members of the school board appealed as well from the April 3 order. On April 8 we denied a motion by the board members for a stay of that latter order. Since that time no effort has been made either to appoint an examiner, or to request the Chancellor to do so.

F. *1975 School Board Elections.* On May 11 of this year community school board elections were held again throughout the city. The results solidified CEE control over the District One board: six candidates backed by the United Federation of Teachers were elected (Roher, Price, Goodman, and Rubin—all incumbents—along with Charles S. Bayor and Theresa Bussichio), and only three Coalition candidates (Wong, an incumbent, and Elizabeth Colon and Carmelo Diaz). The new board is to take office on July 1, 1975.

II

Fuentes challenges the denial of his application for an injunction against the administrative proceedings, and the dismissal of his action, on a number of grounds. He urges most forcefully that the administrative procedures which are to determine the charges brought by the school board deny him his right to due process for several reasons. As we have noted, hearing examiner Cowan resigned in early February for reasons of health, and despite Judge Stewart's April 3, 1975 order, no one has since been appointed to replace him. Fuentes consequently claims that no expeditious determination of the allegations against him is possible, and that the district court should have dismissed the charges instead of keeping him suspended in limbo. He contends that Judge Stewart was without power to order the appointment of an examiner to replace Cowan, and in this claim he is joined by the Coalition members of the board—defendant-appellants in this case—who have refused to comply with the April 3 order although this court denied a stay pending appeal.

Fuentes also argues that he is denied due process by the administrative procedures since the combination of functions

---

**3.** That paragraph provides:

    a. In addition to the conditions enumerated in the public officers law creating a vacancy, a member of a community board who refuses or neglects to attend three successive meetings of his board of which he is duly notified, without rendering a good and valid excuse therefor to the other members of his board, vacates his office by refusal to serve. Paragraph (b) of the same subsection provides that "Vacancies shall be filled for the unexpired term by the community board."

performed by the school board, which initiated the charges against him and appointed a lawyer to prosecute them before the hearing examiner, besides providing at least some of the evidence relevant to their determination, and passing on the examiner's recommendation, is inconsistent with rudimentary procedural fairness. He also alleges that the district court erred in its determination that board chairman Roher and Richard Lee Price, another CEE board member, were not biased by the nature of their previous dealings with Fuentes, and would be able to make an even-handed assessment of the grounds for dismissal.

The claim is also made by Fuentes that his suspension and the initiation of proceedings against him violated his rights to freedom of speech and association, since three of the 41 grounds which prompted the board's action relate to his conduct during the 1973 and 1974 campaigns for elections to the community school board.[4]

A. *Exhaustion of Administrative Remedies.* A necessary prelude to our consideration of Fuentes's underlying claims is a brief discussion of the law in this Circuit on the need to exhaust administrative remedies prior to bringing an action under § 1983. The Supreme Court recently stated, in *Steffel v. Thompson,* 415 U.S. 452, 472–73, 94 S.Ct. 1209, 1222, 39 L.Ed.2d 505 (1974), that

When federal claims are premised on 42 U.S.C. § 1983 and 28 U.S.C. § 1343(3)—as they are here—we have not required exhaustion of state judi-

cial or administrative remedies, recognizing the paramount role Congress has assigned to the federal courts to protect constitutional rights.

*See also Ellis* v. *Dyson,* 421 U.S. 426, 95 S.Ct. 1691, 44 L.Ed.2d 274 (1975). We noted in *Plano* v. *Baker,* 504 F.2d 595, 597 (2d Cir. 1974), that this statement in *Steffel* was merely dictum as it related to administrative procedures since *Steffel* dealt only with state judicial remedies. Other Supreme Court cases indicating that exhaustion of state administrative remedies may be unnecessary[5] have been interpreted by this court in *Eisen* v. *Eastman,* 421 F.2d 560 (2d Cir. 1969), *cert. denied,* 400 U.S. 841, 91 S.Ct. 82, 27 L.Ed.2d 75 (1970), and in *Blanton* v. *State University of New York,* 489 F.2d 377 (2d Cir. 1973), " 'as simply condemning a wooden application of the exhaustion doctrine in cases under the Civil Rights Act.' " 489 F.2d at 383, *quoting* 421 F.2d at 569. Indeed, the Supreme Court, as recently as 1973, stated that "[s]tate administrative remedies have been deemed *inadequate* by federal courts, *and hence not subject to the exhaustion requirement,* on a variety of grounds" [emphasis added]. *Gibson* v. *Berryhill,* 411 U.S. 564, 575 n. 14, 93 S.Ct. 1689, 1696, 36 L.Ed.2d 488 (1973). Consequently this court, albeit with some hesitation, *see Plano* v. *Baker, supra,* at 597, has continued to require exhaustion of administrative remedies.

▉ There are, however, important qualifications to that requirement which

---

4. In addition to his claim based upon 42 U.S.C. § 1983 (1970), Fuentes asserted a right to damages under New York law for breach of contract and for defamation. Although Judge Stewart grounded his dismissal of these latter causes of action upon the principle that a federal court should not entertain pendant state claims once the underlying federal questions have been dismissed, *see United Mine Workers* v. *Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), Fuentes argues that his state law claims were not in fact pendant, but had an independent jurisdictional basis in diversity. 28 U.S.C. § 1332 (1970).

Because we must remand this action for a modification of the order of April 3 in any

event, we remand the state law issues as well for consideration of the claim that diversity jurisdiction existed.

5. *McNeese* v. *Board of Education,* 373 U.S. 668, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963); *Damico* v. *California,* 389 U.S. 416, 88 S.Ct. 526, 19 L.Ed.2d 647 (1967); *King* v. *Smith,* 392 U.S. 309, 312 n. 4, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968); *Houghton* v. *Shafer,* 392 U.S. 639, 88 S.Ct. 2119, 20 L.Ed.2d 1319 (1968); *Wilwording* v. *Swenson,* 404 U.S. 249, 92 S.Ct. 407, 30 L.Ed.2d 418 (1971); *Carter* v. *Stanton,* 405 U.S. 669, 92 S.Ct. 1232, 31 L.Ed.2d 569 (1972); *Gibson* v. *Berryhill,* 411 U.S. 564, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973).

have been noted. One exception is presented where the question of the adequacy of the administrative remedy is for all practical purposes coextensive with the merits of the plaintiff's constitutional claim, *Gibson* v. *Berryhill, supra,* 411 U.S. at 575, 93 S.Ct. 1689; *Finnerty* v. *Cowen,* 508 F.2d 979, 982–83 (2d Cir. 1974), which is clearly the case here. Fuentes has argued that because a hearing examiner has not been appointed, there can be no expeditious administrative determination of the charges against him. *See Smith* v. *Illinois Bell Tel. Co.,* 270 U.S. 587, 46 S.Ct. 408, 70 L.Ed. 747 (1926). He continues, that no impartial determination is possible since the board performs a variety of functions, *cf. Wasson* v. *Trowbridge,* 382 F.2d 807, 813 (2d Cir. 1967), and in addition, that several board members have prejudged his case. *Gibson* v. *Berryhill, supra,* 411 U.S. at 578–79, 93 S.Ct. 1689. Because of these contentions, we shall proceed directly to consider the merits of Fuentes's due process claims.

B. *Appointment of Hearing Examiner.* Fuentes argues that the district court's March 18, 1975 decision, by directing him to pursue his administrative remedy, relegated him to a futile procedure, because no examiner has ever been appointed to replace Cowan. We may note *en passant* that we would have no occasion to deal with this claim, had the pro-Fuentes faction of the board complied with Judge Stewart's April 3, 1975 order requiring the appointment of a new examiner by April 7, or a request that Chancellor Anker do so by April 11. Despite our denial of a stay of that order on April 8, 1975, pending appeal, the board members have failed to comply.

But Fuentes and the appellant board members insist that the district court was without power to order continuation of the hearing. They argue instead, that the more appropriate procedure would have been to dismiss the charges against Fuentes, citing as authority *United States* v. *Favaloro,* 493 F.2d 623 (2d Cir. 1974). *Favaloro,* however, involved dismissals under the Second Circuit Rules

Regarding Prompt Disposition of Criminal Cases and it offers little that can be of assistance to us here. Not only were the dismissals in *Favaloro* mandated by the Rules themselves—and not by any constitutional requirement—but many of the policies underlying the rules, such as the need to maintain "public confidence and respect for the process of law enforcement" by avoidance of delay, *id.* at 625–26, have no application to this case.

There are, however, even more persuasive reasons for finding that Fuentes's situation is quite unlike that of a criminal defendant against whom an unwilling prosecutor has refused to proceed. Most significantly, dismissal of the charges against Fuentes and overturning his suspension would have the effect of granting specific performance of a contract for personal service, when at least four of the present members of the board, by approving his suspension and preferring the 41 charges on August 8, 1974, have indicated their inability to work with him because they believed him to be recalcitrant as well as incompetent. Nor is it of little importance that the allegations pending against Fuentes are considerably less serious than a criminal indictment. We are not to be understood as saying the charges may not, unless finally resolved, have an impact upon him. We do say, however, that the federal courts need not be so quick to decree their dismissal—given the countervailing considerations here present—as they are to safeguard a defendant against criminal charges which have been pending for an indefinite period of time.

Accordingly, we conclude that the district court rightly exercised its equitable discretion and power in ordering the board to name, or in the alternative, to request the Chancellor to appoint, a hearing examiner. Although unconditional dismissal of the allegations brought against Fuentes would not have been appropriate as an initial step, the court could not and did not ignore Fuentes's justifiable desire for a speedy

resolution of the controversy. The April 3, 1975 order provided a satisfactory accommodation of both the board's and Fuentes's concerns.

■ One final word on this subject is in order. The persistent intransigence by the Coalition board members during the past two months in refusing to comply with Judge Stewart's order indicates that some modification of the order may be advisable. It is quite conceivable, for example, that Fuentes's contract might not be renewed on July 31 of this year, and that the undetermined pending charges might affect his ability to secure future employment. Although the courts are not without power to impose more stringent sanctions on the board members for noncompliance with lawful orders, see 18 U.S.C. § 401(3) (1970), we believe—in light of the conclusion we reach on the other issues, *infra*—that fairness to all concerned requires that we remand the case to the district court so that it can modify its April 3 order to read:

It is hereby

Ordered that the defendant members of local community School Board Number One appoint a hearing examiner within three days from the date of this order; in the event that the board members fail to do so, this court shall request the Chancellor to appoint a hearing examiner within six days from the date of this order. In the event that the Chancellor for any reason shall decline to do so, it is

Ordered that the charges brought against Luis Fuentes by local community School Board Number One on October 18, 1973 and on August 8, 1974 be dismissed.

■ C. *Combination of Functions.* Fuentes also alleges that the administrative procedures fail to comport with due process because of the combination of functions performed by the school board.

The board, he says, initiated the charges against him, appointed a lawyer to prosecute them before the hearing examiner, provided at least some of the evidence relevant to their determination, and will ultimately pass on the examiner's recommendation. In large measure, however, this claim is disposed of by the Supreme Court's recent decision in *Withrow* v. *Larkin,* 421 U.S. 35, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975). In *Larkin,* the plaintiff, a physician, sought to enjoin enforcement of a Wisconsin statute which gave the state medical examining board the power to suspend licenses after holding its own contested hearing. Although the hearing was a full adversary proceeding, the board not only initiated the charges leading to suspension, but also conducted its own investigation, and rendered a decision based upon that evidence, which was presented to the board by an assistant attorney general. The Supreme Court reversed the preliminary injunction against the medical board's procedures, finding it "quite unlikely that appellee would ultimately prevail on the merits of the due process issue . . . . ." *Id.* at 46, 95 S.Ct. at 1464. In view of the holding in *Larkin,* we see little reason to question as an abstract matter the procedural fairness of the combination of functions performed by the school board in this case, at least where as here there is an initial hearing by an independent hearing examiner and full review of the board's decision by the commissioner of education.

D. *Prejudgment and Bias.* Fuentes maintains also that several of the board members—in particular Roher and Price—are impermissibly biased, and have prejudged his case. Both men, Fuentes claims, have been the target of his personal abuse and criticism. Several of the specifications in Charge II of the August 8, 1974 allegations, for example, note that Fuentes has called Roher a "liar," has stated that he was "through dealing with [Roher] as a human being," and has threatened violence to members of the board who did not make "wise"

decisions. Price also filed a counterclaim for defamation in this very action, and, in addition sought damages for what he alleged to be Fuentes's part in overturning his election to the board in 1973. *Cf. Coalition for Education in District One v. Board of Elections, City of New York,* 370 F.Supp. 42 (S.D.N.Y.), *aff'd,* 495 F.2d 1090 (2d Cir. 1974). Moreover, Roher testified at length at the October 31, 1974 administrative hearing concerning at least ten of the 41 specifications. Both he and Price testified in the district court that some of the charges were true although, both added, there may have been justifiable reasons for Fuentes's conduct which had not yet been brought to light. Under these circumstances, it is argued, the board's decision to affirm or reject the recommendation of the hearing examiner is a foregone conclusion.

It is well established that the probability of bias on the part of a decisionmaker may be too great to be constitutionally tolerable, when he has been the target of personal abuse or criticism by the party before him. *See, e. g., Taylor v. Hayes,* 418 U.S. 488, 501–03, 94 S.Ct. 2697, 41 L.Ed.2d 897 (1974); *Mayberry v. Pennsylvania,* 400 U.S. 455, 91 S.Ct. 499, 27 L.Ed.2d 532 (1971); *Pickering v. Board of Education,* 391 U.S. 563, 578–79, n. 2, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). Nor can we ignore the possibility of prejudgment by a decisionmaker himself engaged in litigation with the defending party. *Cf. Gibson v. Berryhill, supra,* 411 U.S. at 578–79, 93 S.Ct. 1689. Finally, we believe it is difficult if not impossible for a hearing examiner like Roher to give a detached judgment when it is his testimony which provided a substantial part of the case against Fuentes.

And yet, we cannot fail to recognize that this case, involving dismissal of an employee by his immediate superior, is quite unlike the more detached relation so necessary between judge and defendant, *Mayberry v. Pennsylvania, supra; cf. Taylor v. Hayes, supra,* or between a regulatory board and one subject to its control, *Gibson v. Berryhill, supra,* or indeed, between school board and teacher, *Pickering v. Board of Education, supra,* 391 U.S. at 568–71, 88 S.Ct. 1731. As the Court noted in *Pickering,* "significantly different considerations [are] involved" for "positions in public employment in which the relationship between superior and subordinate is of such a personal and intimate nature that certain forms of public criticism of the superior by the subordinate would seriously undermine the effectiveness of the working relationship between them." *Id.* at 570 n. 3, 88 S.Ct. at 1735. In such cases, for example, an employer-employee dispute must of necessity engender some degree of personal involvement by the superior. *Arnett v. Kennedy,* 416 U.S. 134, 156 n. 21, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974) (allegation that superior had accepted a bribe) (opinion of Rehnquist, *J.*). Indeed, in most cases "the employee's supervisor is the official best informed about the 'cause' for termination." *Id.* at 170 n. 5, 94 S.Ct. at 1652 (opinion of Powell, *J.*). *Cf. Jaqueth v. Guilford School District,* 123 Vt. 382, 386, 189 A.2d 558, 561 (1963) (Oakes, *J.*). And to bypass the immediate superior in the first instance in favor of a more detached decisionmaker would often require going outside the agency or employment relationship before dismissal could be effected. *Id.* 416 U.S. at 156 n. 21, 170–71 n. 5, 94 S.Ct. 1633.

■ We are not holding, of course, that *final* action by one so immediately concerned in the case as Roher or Price is permissible. The Court emphasized in *Arnett v. Kennedy,* for example, that although discharge without pay might be within the superior's discretion, Kennedy was assured a full trial-type hearing after dismissal. *Id.* at 145–46, 94 S.Ct. 1633. Viewed from this perspective, the procedures which would be employed in Fuentes's case offer even more protection to him than was provided to Kennedy. Here, Fuentes is assured a full

hearing with rights to notice, retained counsel and the opportunity to call and to cross-examine witnesses, before his immediate superior, the board, may even direct his dismissal. Nor can we say that the right to appeal an adverse decision to the City Board and then to the State Commissioner of Education falls short in any way of the right of review provided in *Arnett*. The City Board is empowered also to appoint its own examiner to duplicate the hearing which had already been held before dismissal. But such a procedure would offer little additional protection to Fuentes, when the City Board and Chancellor have available both the record of the earlier hearing and the recommendation of the examiner. And as the Commissioner of Education noted recently, in overturning a dismissal under almost identical circumstances,

> The weight to be given . . . testimony [by board members before the examiner] and the findings of fact based thereon will be strongly influenced by the multiplicity of functions which the board performed and by the evidence of the existence of . . . prejudice or bias. . . .

*Matter of Appeal of Abramowitz*, 14 Ed. Dept.Rep. —— (Decision No. 8990, April 7, 1975). We are not unaware of the argument that the City Board's and Commissioner's determinations could be affected by the prior decision of the local board. But we cannot say that any such influence, if indeed it should exist, is different in degree or in kind from that which the decision by Kennedy's superior had upon the body which was to review his dismissal.

We are thus unable to find in the assertion of prejudgment or bias by the members of the local board a deprivation of procedural due process.

■ E. *Free Speech.* We come now to Fuentes's important First Amendment claims. He argues that federal jurisdiction over his case is founded not only upon his allegations that the administrative procedure deprived him of due process, but that in addition, his suspension and the initiation of proceedings against him abridged his first and fourteenth amendment rights of free speech and association. Three of the 41 specifications put forward as grounds for dismissal of Fuentes concerned his "vitriolic" campaign activity, during the bitter 1973 and 1974 board elections, which the board found had the effect of "reducing and impairing his ability to function as an employee of said Board . . .." Although we entertain serious doubt over the viability of Fuentes's first amendment claim,[6] we find it unneces-

6. As the Supreme Court noted in *Pickering* v. *Board of Education*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968), "the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." Thus the necessity of preserving confidentiality, and of preventing "certain forms of public criticism of the superior by the subordinate [which] would seriously undermine the effectiveness of the working relationship between them" might well justify dismissal *for* speech which otherwise would deserve constitutional protection. *Id.* at 570 n. 3, 88 S.Ct. at 1735. *Cf. Arnett* v. *Kennedy*, 416 U.S. 134, 162, 94 S.Ct. 1633, 40 L.Ed.2d 15 (opinion of Rehnquist, *J.*), 164 (opinion of Powell, *J.*), 202–03 (opinion of White, *J.*) (1974) (rejecting overbreadth attack on 5 U.S.C. § 7501(a), which had been employed to secure appellee's dismissal for statement that his superior had accepted a bribe); *Meehan* v. *Macy*, 129 U.S. App.D.C. 217, 392 F.2d 822, 835 (1968), *modified*, 138 U.S.App.D.C. 38, 425 F.2d 469, *aff'd en banc*, 138 U.S.App.D.C. 41, 425 F.2d 472 (1969) ("[a government] employee . . . cannot reasonably assert a right to keep his job while at the same time he inveighs against his superiors in public with intemperate and defamatory [statements]").

Indeed, with regard to the very activity here asserted to be constitutionally protected—partisan campaigning for a board election—it is worthy of note that the Hatch Act, 5 U.S.C. § 7324(a)(2) (1970), denies to federal employees of executive agencies the same right which Fuentes would arrogate to himself. This provision has been sustained by the Supreme

sary to reach that issue since the board's final decision has not "been formalized, [nor have] its effects [been] felt in a concrete way" by Fuentes. *Cf. Abbott Laboratories* v. *Gardner,* 387 U.S. 136, 149, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). Fuentes, although suspended, has not yet suffered even a temporary interruption of income, but has continued to receive his full salary since the board's initial action. And although administrative proceedings which may lead to dismissal have been initiated, it has not yet been determined whether the evidence supports the specifications regarding his campaign conduct nor, more importantly, whether if substantiated those charges would constitute valid grounds for dismissal. *Cf. Stevenson* v. *Board of Education,* 426 F.2d 1154, 1157 (5th Cir.), *cert. denied,* 400 U.S. 957, 91 S.Ct. 355, 27 L.Ed.2d 265 (1970). Under these circumstances we see little reason to enjoin Fuentes's suspension or the board's deliberations, particularly in light of the 38 other and serious grounds which it has been suggested would support his discharge.[7]

We affirm the dismissal of the federal claims. The order of April 3, 1975 is to be modified as indicated, and in all other respects the district court will proceed in accord with this opinion.

Court on more than one occasion, *United Public Workers* v. *Mitchell,* 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947); *United States Civil Service Commission* v. *National Association of Letter Carriers,* 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973); *cf. Broadrick* v. *Oklahoma,* 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973), and serves a number of significant purposes. Not least among them—and relevant here—are the prevention of partisan policy-making by employees who may have acquired party loyalties through political activism, and the need to prevent civil employees from using official powers or prestige to influence voters improperly. Perhaps even more significant in a relationship as intimate as that between the local board and the community superintendent, active support for unsuccessful candidates, and opposition to those ultimately elected, can strain working conditions

beyond endurance, particularly where the superintendent's tenure of office will carry him into the term of the newly elected board.

7. In so saying we do not wish to be understood as drawing back from our position, expressed in *Simard* v. *Board of Education of Town of Groton,* 473 F.2d 988, 995 (2d Cir. 1973), that "a discharge motivated only in part by demonstrable retaliation for exercise of speech and associational rights is equally offensive to the Constitution." We do believe, however, that application of that doctrine should await a more conclusive showing that the plaintiff has actually been affected by state action in response to his exercise of protected rights.